**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|                              |   |                          |
|------------------------------|---|--------------------------|
| **USA,**                     | : |                          |
|            **Plaintiff,**    | : |                          |
|          **v.**              | : | **CRIMINAL ACTION**      |
|                              | : |                          |
| **JOSEPH SAROEUTH,**         | : | **NO.  10-cr-462-01**    |
|          **Defendant.**      | : |                          |

**Tucker, J.**                                                   **April ____, 2011**

      Currently pending before the Court is Defendant's Motion to Suppress (Doc. 21) and the Government's Response in Opposition thereto (Doc. 25).  For the reasons discussed below, the Court grants Defendant's motion.

## I.  Background

      On November 10, 2009, defendant Joseph Saroeuth was charged by a federal grand jury sitting in the Eastern District of Pennsylvania in an indictment with one count of unlawfully possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  The alleged facts giving rise to Defendant's indictment are as follows.

      On June 22, 2010, at approximately 7:17 p.m., Philadelphia Police Radio Dispatch received an anonymous call.  The caller stated her belief that there would be a shooting in the vicinity of 6th and Wolf Streets in Philadelphia.  Approximately one minute later, at 7:18 p.m., Philadelphia Police 3rd District Officers Newell and Padilla, who were on patrol in plain clothes in an unmarked vehicle, received a radio dispatch call stating the following: "Person with a gun. A large fight. Several people armed with guns.  No flash."  The officers were proceeding southbound on 6th Street when they received the call.

In response, the officers proceeded to the scene, just south of the corner of Wolf and 6th Streets.  Upon arrival, the officers observed a large group of approximately fifteen to twenty Asian adult and teenage males dispersing, but no fight in progress.  Officers Newell and Padilla also recognized Mr. Saroeuth, with whom they were familiar from previous contacts on the street, as well as previous arrests.  The officers were aware that Mr. Saroeuth was a member of a well known Asian gang.  During previous casual encounters with the officers, Mr. Saroeuth had been cooperative, agreeing to speak with them voluntarily.

Officer Padilla stopped the unmarked patrol vehicle in the middle of the street.  Officer Newell emerged from the halted vehicle and directly approached Mr. Saroeuth.  Officer Newell inquired, "Joe, everything all right, everything cool?"  Immediately after posing this question, Mr. Saroeuth ignored Newell, mounted his bicycle, and rode away northbound on 6th Street.  At approximately 7:20 p.m., the officers began to pursue Mr. Saroeuth and called in the following flash: "Asian male, on a bike, blue shorts, white t-shirt, long hair, long hair, eastbound on Wolf." As Mr. Saroeuth began to flee, Officer Newell noticed that Mr. Saroeuth was holding his right pants pocket.  While calling in Mr. Saroeuth's description, Officer Newell also observed a marked police vehicle approaching southbound on 6th Street, just north of Mr. Saroeuth.  Turning eastbound on Wolf Street, Mr. Saroeuth made a right away from the approaching vehicle.  Mr. Saroeuth continually held his right pants pocket throughout the encounter.

Next, Mr. Saroeuth alighted from his bicycle and ran into the park, where he was confronted by Officers Newell and Padilla, who were approaching him from the south.  Newell drew his service pistol, ordering Mr. Saroeuth to drop to the ground.  At that point, Mr. Saroeuth immediately went down to the ground, putting his hands up.  Officer Newell patted down Mr.

Saroeuth and felt what he believed to be a firearm.  Next, Officer Newell recovered from Mr. Saroeuth's right pants pocket a .38 caliber special revolver, loaded with five rounds of ammunition. After recovering the gun, radio communications between officers continued.  A uniformed police sergeant from another location in the area inquired about whether there was a complainant or witnesses at the scene, to which Officer Newell replied "negative."  Officer Newell then called his own police sergeant over radio, and was instructed by his sergeant to contact him via cell phone.

Prior to Mr. Saroeuth's arrest on June 22, 2010, Officer Newell and Padilla were aware of a previous shooting two days prior in the same neighborhood, on the 2300 block of South 5th Street, one block east of the intersection of 6th and Wolf Streets.  In the incident, a male matching the defendant's description fired a gun at a passing vehicle.

## II.  April 4, 2011 Suppression Hearing

On February 25, 2011, Defendant filed a Motion to Suppress (Doc. 21) the firearm recovered by Officer Newell prior to Defendant's arrest on June 22, 2010.  The Government filed a Response in Opposition thereto (Doc. 31) on April 1, 2011.  The Court held a hearing and oral argument on the motion on April 4, 2011.  During the hearing, the Government presented evidence in the form of an audio tape with the radio calls from the day of the incident in question, and the testimony of Officer Newell.  Additionally, the Government entered three exhibits: (1) color photos illustrating the area where the June 22, 2010 encounter took place; (2) a photograph of the gun seized from Defendant on the date in question; and (3) a signed property receipt describing the gun and ammunition seized from Defendant.

### III.  Discussion

Defendant argues that the firearm recovered from Mr. Saroeuth by Officer Newell on June 22, 2010 must be suppressed because the search and seizure leading up to the recovery of this physical evidence violated Mr. Saroeuth's Fourth Amendment rights.  There are three issues to be decided.  First, the Court must determine at what point the officers' actions constituted a Terry stop.  Secondly, the Court must determine whether the requisite reasonable suspicion existed for a Terry stop of Defendant, and lastly, whether there was probable cause for his arrest.  For the reasons that follow, the Court finds that Defendant's Fourth Amendment rights were violated, and the physical evidence recovered from Mr. Saroeuth should be suppressed as fruit of the Defendant's unlawful arrest.

Defendant claims that Officer Newell's recovery of the loaded gun was in violation of his Fourth Amendment right against unlawful search and seizure because the initial pursuit of the Defendant constituted an unjustified Terry stop, as the officers lacked reasonable suspicion to pursue the Defendant, as the Defendant was merely exercising his lawful right to disengage from a casual encounter with the police.  Furthermore, Defendant claims that Officer Newell lacked the probable cause needed to search Defendant's person and seize the loaded gun.  Defendant pointed out that in the pursuit, Officer Newell curiously failed to mention in his flash that he suspected Defendant was armed.  Defendant argues that this fact shows that the officers lacked the required reasonable suspicion to stop Defendant.

The Government disagrees, and argues that the officers' detention of Defendant did not begin until they caught up to Defendant in the park, and that officers had reasonable suspicion to stop Defendant because of his unprovoked flight, and then to frisk him due to his clutching of his

right pants pocket as he fled. Through Officer Newell's twelve years of experience as a police officer at the time of the incident, he judged Defendant's actions as unusual and suspicious, particularly given Defendant's past agreeable nature during interactions with the same officers. Officer Newell's testimony characterized Defendant's actions at the scene as fleeing, stating that the Defendant proceeded to peddle "fast" from the scene in response to Officer Newell's approach and questioning upon arrival at the scene. Further, Officer Newell testified that given his experience as a narcotics officer who carried a gun in his pants pocket previously, he recognized that the way in which Defendant clutched his right pants pocket as he rode away from the police officers to be indicative of one attempting to prevent a gun from falling from his pants pocket. The Government contends that these facts, combined with the facts that the incident occurred in a high crime area, came as the result of an anonymous tip of a male with a gun, and involved Defendant's alleged unprovoked flight, provided sufficient reasonable suspicion for the officers to conduct an investigatory Terry stop.

Additionally, the Government argues that Officer Newell's search of Defendant's person constituted a typical frisk conducted during a Terry stop, and thus the lower requirement of reasonable suspicion should be applied to this action. Officer Newell testified that during the search, he proceeded directly to Defendant's right pant pocket, the suspicious area, to conduct the pat down. The Government further asserts that during the pat down of Defendant's right pocket, Officer Newell felt an object that he believed to be a firearm, and thus entered the pocket to retrieve the item. The Government argues that Officer Newell's actions rose to a level requiring probable cause only when Officer Newell entered Defendant's pants pocket, and that the officer possessed the requisite probable cause to do so based on the circumstances and the officer's

detection of a deadly weapon as a result of the pat down.

Under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court articulated an exception to the general rule that probable cause is required for a search and seizure not to be violative of an individual's Fourth Amendment Rights. <u>Florida v. Royer</u>, 460 U.S. 491 (1991) summarizes this exception and the legal standard for a Terry stop, stating "it is also clear that not all seizures of the person must be justified by probable cause to arrest for a crime. Prior to <u>Terry v. Ohio</u>, supra, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. <u>Terry</u> created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." <u>Id.</u> at 498 (citations omitted).

Under <u>United States v. Sokolow</u>, 490 U.S. 1(1989), the Supreme Court determined that "the concept of reasonable suspicion . . . is not readily, or even usefully, reduced to a neat set of legal rules," but instead, should be determined by evaluating "the totality of the circumstances -- the whole picture." <u>Id.</u> at 7-8 (internal quotation marks and citation omitted). This standard is reiterated in <u>Florida v. Bostick</u>, 501 U.S. 429 (1991), where the Supreme Court stated that "in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." <u>Id.</u> at 439. To do this, a court must first determine *when* the seizure occurred, and evaluate only "the facts available to the officer at the moment of the seizure." <u>United States v. Brown</u>, 448 F.3d 239, 245 (3d Cir. 2006) (quoting <u>Terry,</u> 392 U.S. at 21-22).

The moment of seizure is critical, as noted by the Third Circuit in <u>Brown</u>. "Flight from a lawful frisk or arrest can contribute to a finding of reasonable suspicion; thus, the timing of the seizure could tip the finding in favor of one party or the other." <u>Id.</u> (citing <u>Wardlow</u>, 528 U.S. at 124; United States v. Brown, 159 F.3d 147, 149 (3d Cir.1998)). Moreover, if a suspect flees *after* the seizure, then "the flight 'plays no role in the reasonable suspicion analysis.' " <u>United States v. Smith</u>, 575 F.3d 308, 312-13 (quoting <u>Brown</u>, 448 F.3d at 245).

In <u>Illinois v. Wardlow</u>, 528 U.S. 119 (2000), the Supreme Court clarifies the <u>Terry</u> standard, stating that "[i]n <u>Terry</u>, we held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot... [w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. <u>United States v. Sokolow</u>, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989). The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch'' of criminal activity." <u>Id.</u> at 123-24.

Furthermore, in <u>Wardlow</u>, the Supreme Court explains the relevant factors of the Terry stop analysis. "Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion...[h]eadlong flight -- wherever it occurs -- is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such...the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." <u>Id.</u> at 124-25.

In <u>Wardlow,</u> the Supreme Court distinguishes between headlong flight and an individual's

right to refuse to speak with the police, citing prior Supreme Court decisions . " '[A]n officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.   And any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'" Id. at 125 (quoting Florida v. Royer, 460 U.S. 491 (1983), Florida v. Bostick, 501 U.S. 429 (1991)).

In Wardlow, The Supreme Court also finds that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Brown v. Texas, 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979). But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a Terry analysis." Id. at 124. Ultimately, in Wardlow, the Supreme Court found that suppression of a recovered firearm was unwarranted, based on Defendant's unprovoked flight upon noticing officers in a high crime area. It is important to note that the burden rests upon the Government to articulate facts to support reasonable suspicion.  Florida v. Royer, 460 U.S. 491, 500 (1983).

Generally, Pennsylvania courts have found that where there was no anonymous tip, however, there existed flight, a high crime area, and other suspicious conduct, reasonable suspicion existed.  See Com. v. Cottman, 764 A.2d 595 (Pa. Super. 2000); Com. v. Johnson, 734 A.2d 864 (Pa. Super. 1999), appeal denied, 745 A.2d 1219 (Pa. 1999); Com. v. Spears, 743 A.2d 512 (Pa. Super. 1999); Com. v. Riley, 715 A.2d 1131 (Pa. Super. 1998), appeal denied, 737 A.2d 741 (Pa. 1999).  In cases where there was an anonymous tip, but no flight, Pennsylvania courts

have generally declined to find reasonable suspicion.  *See* Com. v. Wimbush, 750 A.2d 807 (Pa. 2000); Com. v. Hayward, 756 A.2d 23 (Pa. Super. 2000);  Florida v. J.L., 529 U.S. 266 (2000); Com. v. Martin, 705 A.2d 887 (Pa. Super. 1998); Com. v. Hawkins, 692 A.2d 1068 (Pa. 1997), Com. v. Jackson, 698 A.2d 571(Pa. 1997); Com. v. Kue, 692 A.2d 1076 (Pa. 1997).  In cases where there was an anonymous tip but no flight, Pennsylvania courts have found reasonable suspicion only where there was a high crime area and other suspicious conduct or imminent danger to support the police officers' actions.  *See* Com. v. Zhahir, 751 A.2d 1153 (Pa. 2000); Com. v. McDonald, 740 A.2d 267 (Pa. Super. 1999), appeal denied, 757 A.2d 930 (Pa. 2000).  In a case where there was an anonymous tip and flight, the Superior Court of Pennsylvania still declined to find reasonable suspicion where there were no additional factors to support such a finding.  Com. v. Lynch, 773 A.2d 1240 (Pa. Super. 2001).

This district has produced varied holdings concerning whether the suppression of evidence is warranted due to a lack of reasonable suspicion, based on the instant evidence.  In United States v. Shambry, 392 F.3d 631 (3d Cir. 2004), where officers recovered a gun from a Defendant whom they recognized as the driver of a vehicle that intentionally struck one of the officers a few weeks earlier, the court affirmed the district court's finding that officers possessed reasonable suspicion for the pat down and search of the fleeing defendant in order to investigate his previous involvement in the hit-and-run incident, and denied suppression of the recovered firearm.  Id. at 635.

By contrast, the court in Johnson v. Campbell, 332 F.3d 199 (3d Cir. 2003) found that defendant's Fourth Amendment rights were violated by police during an unlawful investigatory stop.  In this case, the officers received a call from a motel clerk concerning a man acting in an

agitated manner.  Id. at 202.  Subsequently, the police approached defendant, who was reading a

newspaper in his parked car in the motel parking lot, detained defendant without reasonable

suspicion after defendant declined to engage with the officers, and thereafter arrested defendant

for disorderly conduct.  Id. at 203, 209.

As an initial matter, the Court finds that the Terry stop began once the officers' pursuit of

Defendant started, which occurred upon Officer Newell's radio call concerning his pursuit of

Defendant immediately after Defendant ignored and peddled away from Officer Newell.  It is well

established that a seizure is effectuated when police conduct leads a reasonable person to believe

that he is no longer "free to decline the officers' requests or otherwise terminate the encounter."

Bostick at 439.  As applied to this matter, when Defendant first peddled away and ignored Officer

Newell's question, he believed that he was free to walk away from the encounter.  It was not until

Officer Newell began to pursue Defendant and made a radio call concerning such pursuit that the

encounter became a seizure.  At that point of pursuit by Officers Newell and Padilla in an

unmarked car, and eventually the additional pursuit of officers in a marked car, no reasonable

person would believe that he was free to go about his business.

The evidence concerning whether Defendant fled is material to the Court's analysis, as

Wardlow indicates that unprovoked flight constitutes evasive behavior, and is a factor in

determining whether reasonable suspicion existed, however, mere refusal to cooperate with the

police does not support reasonable suspicion.  Defendant argues that he was not fleeing the scene,

but was merely exercising his lawful right to ignore police questioning and proceed on his way.

The Court finds Defendant's position supported by the aforementioned evidence.  As Officer

Newell approached Defendant, Defendant opted to ignore Officer Newell and peddle away, which

at that point constituted a mere encounter.  Thus, the Court cannot factor the Defendant's provoked flight into its analysis of whether reasonable suspicion existed, as such flight occurred *after* the officers' actions which constituted detention of Defendant.

The events leading up to the pursuit included a dispersing crowd in a high crime area, however, the people were walking, and not running away.  Thus, no criminal activity was afoot when the officers arrived at the scene.  Officer Newell testified that at the time of the incident, it was still daylight.

Further, despite the Officer's contention that Defendant was agreeable during past interactions, it is unreasonable, and not "commonsense judgment", as required by Wardlow, for officers to believe that Defendant should display the same agreeable nature under the circumstances on June 22, 2010.  In past encounters with Defendant, Officer Newell testified that he and his partner were typically patrolling the area where there were no incidents or scenes to speak of, and asking casual, general questions, such as "how are you" and "are you staying out of trouble?".  By contrast, on the day in question, Officer Padilla rushed to the scene of a fight, and stopped the unmarked patrol car in the middle of the street before Officer Newell emerged and approached Defendant, asking a more pointed question that implied that the officers were questioning Defendant about the scene at hand.  Under these circumstances, the Court finds that it was not commonsense judgment for the officers to believe that Defendant's actions of ignoring the officers and opting to leave the scene were suspicious or uncharacteristic.

According to Officer Newell, based on his experience, the way in which Defendant clutched his pocket aroused the officers' suspicion that Defendant was carrying a gun.  However, as Defendant aptly points out, Officer Newell failed to indicate this suspicion in his flash report

over the radio while pursuing Defendant.

The pertinent facts offered by the Government include the following: (1) the incident in question occurred in high-crime area; (2) the anonymous tip call stated that there was a fight and an armed male in the vicinity; (3) Defendant acted uncharacteristically when approached by officers; (4) Defendant fled the scene and avoided officers in pursuit of him; (5) Defendant was observed clutching his right pocket in a suspicious fashion as he peddled away from officers.

Concerning item (1), the Court finds that despite the high-crime area, the incident occurred during daylight hours when no criminal activity was afoot. The Court finds that concerning item (2). the anonymous tip held little credibility, as the anonymous informant held no special identity which would lead the officers to believe in the veracity of the information, nor was there an adequately detailed description of a suspect to support reasonable suspicion of Defendant. Any one of the Asian males dispersing when the officers arrived on the scene could have matched the tip of the anonymous caller, so without more, the officers' singling out of Defendant was unsupported. The court has already addressed item (3), finding that it was unreasonable for the officers to characterize Defendant's actions as atypical, particularly where the incident at hand was atypical when compared to Defendant's past interactions with the officers. As mentioned previously, concerning item (4), the Court finds that Defendant was not fleeing the scene immediately prior to being pursued, but was merely peddling on his bike and exercising his right to go about his business, as permitted under the law. This leaves items (5). The Court finds that Officer Newell's testimony concerning the clutching of Defendant's right pants pocket is questionable, and does not support reasonable suspicion.

Unlike <u>Shambry</u>, here, the officers lacked firsthand knowledge that Defendant committed

a crime prior to detaining Defendant, thus the Court rejects the Government's argument that Shambry is analogous to the current facts. The Court finds Johnson more instructive. Similar to the Defendant in Johnson, Defendant in the instant case exercised his right to terminate an encounter with the police by going about his business on his bicycle, and officers reacted to this by unlawfully detaining and searching Defendant without reasonable suspicion.

Upon consideration of the totality of the circumstances, the Court finds that the Government has failed to fulfill its burden of showing that reasonable suspicion existed, justifying the pursuit and ultimate physical detention of Defendant. Thus, it follows that since the Court finds that the officers did not possess the requisite reasonable suspicion to pursue and detain Defendant, for the same reasons, the officers lacked the higher standard of probable cause to seize the loaded gun from Defendant's pocket.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress is granted. An appropriate Order follows.

**BY THE COURT:**

**/s/ Petrese B. Tucker**

_____

**Hon. Petrese B. Tucker, U.S.D.J.**